May it please the Court, my name is Larry Postol, and I present the Petitioner Series Marine Terminals. We're here on a Longshore Act case, I'm sure you're well aware of the facts, a man ran over and killed a co-worker driving a forklift in violation of a safety rule. There are three issues, and let me start with Section 7E, Department of Labor, Independent. Because, frankly, I'm sort of fascinated by it, particularly the Director's brief. The Director acknowledges that the legislative history is clear, that Congress said they expected to use the Section 7E IME to help resolve cases, that they expected to follow the National Commission standard. The National Commission standard, which the Director admits, is that basically the IME's should be accepted, subject only to the equivalent of an appellate review, which under Longshore Act would, of course, be substantial evidence, which is, is there any reasonable mind that would accept that person's opinion? This issue is not unlike what this Court decided in V.I.T. v. Edwards with attorney fees. For years, judges ignored the statutory requirement that attorney fees couldn't be awarded if the employer didn't reject a Department of Labor recommendation. The Benefits Review Board, for years, stamped those decisions saying, yep, that's absolutely correct. It doesn't matter what the statute says. And, of course, this Court in V.I.T. v. Edwards said, no, actually, the statute means something. We're going to follow it. The Fifth and Sixth Circuit did the same thing. So here we are again. The Director doesn't contest what the legislative history says. The Director's argument is, seems to be twofold. One is, they said the judge actually followed the appellate review standard, but I don't know how serious they can be about that, because if you read the opinion, it's pretty clear he didn't follow a substantial evidence test in reviewing Dr. Mansheim's report. The Director also – An ALJ has the right to reject the findings of an independent medical examiner, and particularly when those findings sound more like a legal conclusion than a medical diagnosis. Well, I'm not sure it sounded like a legal conclusion, but I think – Well, then, if we don't agree on that, we do agree, I would imagine, that the ALJ can reject. Under the right standing. There can't be a basis for – Yes. And the issue here, really, is whether or not we should engraft, or at least as I see it, and you may well disagree, whether we engraft a zone of danger limitation on this case. Oh, I'll get to that in one second, but – No, I think I'd like you to answer it now. Right now? Yeah. Well, I think those are two separate issues. But, okay, so the zone of danger, yes, that is our argument on the zone of danger, is should you follow what the Supreme Court did, albeit in the FELA case, I'm not going to hide from that fact. And that is a negligence-based statute. This is a statutory statute. Correct, but barely. And the reason why I say barely is because FELA is a workers' compensation statute because it's recoveries for railroad workers having injuries. The statute – But the workers' compensation regime, if it's predicated as it is on – it incorporates the common law premising liability on an employer's negligence. Yes, and the reason – And negligence is not a concept that is imported into the workers' compensation regime. That is correct, and I would disagree with that, although I would note the standard under FELA is pretty liberal. All you have to do is show that the employer didn't provide a safe workplace. If you have someone who's injured, how hard is that to show? But I do agree with Your Honor, it is a negligence standard under FELA, but that wasn't what the Supreme Court's reasoning was. The Supreme Court's reasoning was that, look, we have unlimited claims, we can have fraudulent claims, we can have trivial claims. Everybody who witnessed the accident is a potential plaintiff in FELA. But the trade-off on that – with the Supreme Court – the trade-off is that under the Longshore Act, your obligation to pay is capped, whereas in a FELA, it's not capped. Well, not much of a cap. So there's a maximum compensation rate, which is $62,000 a year, currently, for life. So, I mean, the reality is, most of our cases, they're half-million, million-dollar cases. Because you take the person's life expectancy, their maximum comp rate, and most – particularly the PTSD cases – there's a lot of those under the Defense Base Act – they're almost all over a million dollars. So you are right, there is some trade-off. That is true, I can't deny that. But I wouldn't say it's much of a cap. But you're asking – I mean, okay, so, you know, except you argue it isn't much of a cap, but you're asking us to change policy by incorporating the zone of danger into a statutory provision, when the zone of danger is a negligence concept. And you're asking us to change the policy. Well, let me – it's two things. So I wouldn't say it's actually a negligence standard. I would say it was based on capping damages. To the extent that you're saying – am I saying – I want you to engraft something, the answer is yes. But with all due respect, you guys – the Court has done it before. So – Well, actually, it's more than just a policy, it's actually – it's actually the law. I mean, we are – we have – we have said that we only impose exceptions to Longshoremen – to the Longshoremen's Act that are enumerated in the statute. Well, but – well, let's look at that. So, for example, for second injury fund relief, this Court – in fact, every Court of Appeals has applied at the Director's insistence that to get second injury fund relief, you have to not only show that there's a pre-existing disability which contributes, which is in the statute, but that it also be manifest. That manifest requirement is nowhere in the statute. The Director actually cites the Marino and Perdozo case that says even though you may have a mental condition due to legitimate personnel action, those aren't going to be compensable. Well, that's an exception that the Courts and the Board itself has created. I think it's a good exception, don't get me wrong, but if I have a personnel action that causes me to become stressed and therefore have depression, how is that not a work injury? Well, the Court said, well, it is a work injury, but we think as a matter of policy we're not going to allow a recovery for that. So the last employer rule is another one which is not in the statute, but the Courts have said, hey, when we have multiple exposures to something, we're going to say the last employer is liable. It's not in the statute. So I think the reality is there's always going to be some things, and the Courts have the latitude in interpreting a statute to say, okay, what does it really mean? Think about what we have to work with and begin with. All the statute says is the statute covers an accidental injury. If you think about it, okay, witnessing something upsetting me, that's an accidental injury? I'm pretty sure when the statute was passed in 1927, Congress had absolutely no idea when they said accidental injury that they would think, whatever we are, 90 years later, that was going to encompass witnessing something. But I mean, I think you are correct. I'm asking you to follow what the Supreme Court did, but I'm also asking you to follow other exceptions that this Court has done, not the least of which is Marino and Prodenza, which the Director thinks are good ideas and somehow they think is inconsistent. So if we're not going to allow compensation for legitimate personnel actions which cause depression, then is that really that much different than to say, look, we're also not going to allow unlimited claims for everybody who witnesses something bad? I mean, think about taking it to its extreme, right? I mean, everything is upsetting. We all hear about the Newtown shootings. We hear about the shootings in California. I mean, it's upsetting. But isn't that a bit of an overstatement because what we are basing it on is not the fact that someone witnessed something upsetting, but that there are diagnoses of medical consequences of that. It's not based on the mere fact of the observation. It's based on the fact that there are medical diagnoses of stress related to that observation. So we're not, it's not quite as unlimited as your question would posit, is it? I think it is. I mean, if we were talking about something where you had a test for an x-ray, it shows a broken bone, sure, we can control that. And you can't have medical diagnoses of post-traumatic stress disorder? Psychiatrists, if you look at this case and what the psychiatrist said, I think all of us, I don't mean to be joking. You just, it was dismissive of the diagnosis. Somewhat yes. I mean, I've got to say psychiatry, they, and it also goes to the whole thing of treating doctor. I mean, treating doctors come in, so one is that oftentimes they're picked by the attorney. Oftentimes, well in this case, they're worried about getting paid because if they don't, if it's not compensable, they're not going to be paid. They're worried about saying the wrong thing, upsetting the claimant, and getting sued for malpractice. In contrast, and that's why, frankly, I was trying to emphasize the Section 780, this was a smart thing by Congress. Congress said, look, let's pick something totally separate, have the Department of Labor pick the doctor, and then you know what? Follow the thing, except appellate review. And I understand the judges have great discretion, but they have to follow the rules, right? And this judge didn't follow the rule, because if the rule, what the director admits in the opinion based on substantial evidence test, he clearly didn't do that. In fact, he basically engaged in speculation. He criticized the doctor for using a standard psychological test. Now, no doctor, there's no evidence in this record that said using that test was wrong. That's like saying, well, I'm not going to take an orthopedist opinion. He relied on an MRI. And then secondly, the judge says, well, he said half the people have seen bad things. There's no evidence in the record to contradict that. Even their own doctor said, well, most people who see those bad things don't get post-traumatic stress syndrome, which Dr. Mansheim agreed with. So the two things the judge criticized Dr. Mansheim both on were actually, there's nothing in the record to support it. And so what I'm asking the court to do is say, look, for Section 70, it should be what the legislative history says, which is an appellate review. And on the Longshore Act, appellate review is substantial evidence, which means could a reasonable mind have accepted what Dr. Mansheim said? Now, that's an easy argument for me for two reasons. One is Dr. Mansheim's board-certified psychiatrist, board-certified infrensic psychiatrist, associate clinical professor, written 25 publications. But most importantly, I have somebody very easy to look to who thought it was a reasonable decision. And that's the United States government district director. The United States government, after the informal conference, the district director said, we're following Dr. Mansheim's opinion. The employer doesn't owe any compensation. And obviously, the claimant appealed to the administrative law judge. So at a minimum, you vacate the decision, send it back, and say, look, follow the legislative history, which even the district director admits requires appellate review, and review it under that standard. Well, you know, you don't, we don't have to consider legislative history if the statute's pretty clear, and it does not. 907C and the regulations 702, 408 are silent as to what weight should be given. And so we can assume, since it's silent, that the statutory scheme intended no dispositive weight to be given to it. Well, but all the time when the legislation is silent, we look at the legislative history. The legislative history says, give it dispositive weight. But also, I would say that's a big assumption. I mean, why would you ask for a 70 evaluation if you weren't going to give it some extra weight? I mean, even just think of it from a reasonable point of view. If someone is independent who reviews something, how can you not give extra weight to the fact that they're independent? And in addition, the director makes sort of a strange argument, says, well, you're allowed to ask for another, a second opinion, so therefore, that shows it wasn't meant to give any weight. I'd say just the opposite, because the statute in 70 says, doesn't say you get a second opinion from anybody. They said, you can only ask for a second opinion from somebody selected by the Secretary of Labor. So to me, that means even more emphasis was given that the only way to get around this was to get a contradictory opinion from another doctor picked by the Department of Labor. I mean, this is, frankly, a tool that is a wonderful tool to avoid litigation. You're saying, OK, you hire your expert, the claimant, the employer hires their expert, and they're fighting at it, and the judge is sitting there, well, who do I believe? The statute says, we've got a good idea. Let's have the Department of Labor, somebody neutral, pick someone to give an opinion, particularly when, I mean, as a judge, it's always hard to evaluate, right? Because you're looking at medical questions. We don't have medical degrees. So we're saying, let's the Department of Labor have somebody who's totally neutral and have that be a doctor who makes a recommendation. Thank you. I'll reserve the rest of the time, if I may. Thank you, Mr. Goldstein. Thank you. Mr. Steingold? Hi, we're Steingold, Your Honor, representing Samuel Paul Jackson. In this matter, we had a ton of due process, OWCP, Office of Workers' Compensation Programs, has a great system set up. We had an informal conference. We had a hearing before the ALJ. We had discovery left and right. We had all kinds of evidence coming in, and the system worked. And here we are today with a decision all within the guidelines of our system. It was a great case. Now, the United States is the greatest seafaring nation ever devised. That is, we have aircraft carriers. We have merchant marine boats. We have longshoremen working the docks. We have cranes that go up to the sky. The United States really, as a national security interest, relies on international trade. Our dealings with China, with Japan, with Germany are all very, very good. Generally speaking, on a macro level, I think we could argue that with trading partners, we are not going to war. And so I once again refer then or relate back to the national security interest that we have relative to our treatment of dock workers. So for example, televisions that we watch, for example, I was watching Clemson and Caroline over the weekend, and I stayed up late enough to watch Stanford and University of Southern California. But our TVs are coming in from the Far East. They are increasing our quality of life. And as a result of that, we are less likely to have any sort of fight with our neighbors in the Pacific. So the United States Congress back in the 70s developed the, I guess, the rules of engagement regarding the longshore workers and the harbor workers. And so we have the Longshore and Harbor Workers Compensation Act. And the public policy of Congress at that time and to this date, to me, appears to be, well, we have a major national security interest at stake. So we want to be as fair as we can to our longshoremen and our harbor workers. And so the system, as I indicated earlier, I believe has been set up to accomplish that. And so, as you guys probably know, the workers are paid very handsomely. They are unionized. They are well-trained. In fact, in order to get a job on the docks is very, very difficult. While you and I are practicing law, or I'm practicing law and you guys are doing what you're doing in February and we're inside, the dock workers are out at midnight with these ships coming in. And it's raining, it's cold, and life is very difficult. In my brief, I argue that the work on the docks is inherently dangerous. I happen to have been born in Norfolk. I live in Suffolk now. I overlook outside my house. I'm lucky enough to overlook the docks of both Norfolk and Portsmouth. I go to Norfolk on almost a daily basis from Suffolk, and I go to the West Norfolk Bridge, and I can see all of the containerized cargo ships that are docked and are unloaded. And we see the trains that are taking the containerized cargo from the docks out to our fellow citizens. It is a very, very big operation. The Port of Virginia is a major, major player in the world. We are developing down in Craney Island the docks that are going to... Counsel, you have 10 minutes set aside. You argue a case like you want, but it sounds like a great... for us, but how about getting to this zone of danger? All right. Will you, sir? Thank you. Well, and so as Judge Floyd has discussed, we believe it's perfectly clear that the zone of danger require... Well, first of all, you have to have a negligence standard in order to deal with the zone of danger, and we are just not a part of the zone of danger. We are a workers' comp situation that any, as Judge Duncan has said also, any relationship to negligence is just not permissible, and the courts have ruled in every case virtually. Why was the ALJ justified in rejecting the views of the independent medical examiner? Well, Your Honor, because the ALJ has that right. The ALJ is the trier of fact. I do understand, but on the facts before us, why was he correct? Why was the ALJ correct in exercising the right in the manner? Yeah, well, thank you, Judge. I appreciate that question. There are really three reasons. One, Dr. Mansheim was totally new to the case. He had read what he had read, and that's fine, and he had seen Paul Jackson maybe... Independent medical evaluations normally are. Evaluators normally are new to the case. That's why they're there, because they're new and fresh and neutral. And well... Right? Something to state what's normal in the case, isn't it? That could be, but that doesn't make their opinion right. In other words... I agree with that, but you start out by saying because of their newness, we should discount them, but that's why they're there. You can't discount somebody for the very reason that they're chosen, can you? Well, I'm not going to discount it just because he's independent, but what happens is, for example, you deal with a fracture. Well, you could have a treating physician that's dealing with a fracture for months and months, but you can have an independent medical exam, look at that fracture, and look at the x-rays. Here, we have a disease. It is a disease. It's a mental disease. It's a disease of the brain, and in this particular instance, having independent people, so-called independent people who really don't even treat these people, who are just seeing them for the first time, they're really treating them almost like a commodity, and we just don't have that in the disease of the brain. I think we have to have more of a structured engagement between the psychiatrist or psychologist and the patient, so I do think we had the right to, or the AOJ had the right to say this was just a one-time shot. Secondly, as Judge Duncan has asked, you'll note that there was this personality test. I don't do a whole lot of this kind of work, but what happened was the facts were revealed that Mr. Jackson went in, met with Dr. Mansheim for an hour or two, whatever it was. Then Mr. Jackson was called back a couple days later and asked to take some sort of multiple personality, well, not multiple personality test, but whatever that test is. The result of the test comes, it's actually graded down in Houston, Texas, and the diagnosis or axis one is PTSD. On that particular objective test, PTSD is the number one determination, so it's really kind of interesting. Therefore, Dr. Mansheim might say X, Y, and Z in his sort of subjective report, but the actual objective report discusses PTSD. So, Dr. Mansheim actually has to go around his elbow to get to his shoulder there by saying, well, even though the personality test says PTSD, I just don't think that it's there. So, I believe there's a legitimate reason. So, there's an inherent conflict between his conclusion and his clinical findings, is what you're saying? Yes, sir. We believe that's in the... That's a fair argument, then. Yes, sir. Thank you. And then the final situation with Dr. Mansheim is that he's retired, I think. There again, it's almost ad hominem type arguments. Maybe he has more time to put to it and concentrate because he's not worried about the vagaries of other work. Well, and that could be, but also his... You're taking on more than you have to choose these things. Yes, sir. Every time. But go ahead. Go ahead. He's retired, and what reason should we discount that? Retiring? Well, I do think that generally what was happening in his particular situation is that Dr. Mansheim was retiring and that this was just the end of his career. And PTSD is kind of new stuff. It's the young, very, very bright people who are dealing with PTSD and treating it as a disease. So some of these guys have been around forever. PTSD is brand new to them. Well, thanks a lot. All right. Ms. Hurley. May it please the Court, my name is Sarah Hurley. I represent the Director, Office of Workers' Compensation Programs. I guess I'd like to just lead off, first of all, with regard to Mr. Postol's argument that the 70 medical examiner is entitled to dispositive weight, I'd like to point out that that proposition is not in the statute, and it's also not in the legislative history. The legislative history refers to the Commission's findings back in, I think it was in the 1960s when that came out. But the legislative history did not adopt the standard of review that the National Commission set forth that substantial evidence review. The legislative history did not specifically adopt that. Is the independent medical examiner, is that testimony considered on par with any other medical testimony in the record? Yes, Your Honor. When the ALJ reviews the case, he would review the independent medical examiner just like he does any other physician. You look to whether the logic of the physician's conclusions, whether it's supported by the tests that he conducted, and then also look at it in light of the other evidence in the record. And that is why, in this case, Dr. Mansheim's opinion wasn't accorded, the ALJ did not accord that independent medical examiner any weight. Actually, he discredited him because he looked at the underlying physician's documentation. He saw that it was based on a computer-generated test that hadn't been evaluated by a clinician. He also saw that it was based in large part on this doctor's assumption that half the population has seen horrible accidents like this accident at issue and that people generally don't develop post-traumatic stress, and that's just an unsupported assumption on the doctor's opinion. And also he looked at the fact that this doctor's opinion was contradicted by practically every other expert in the record, including physicians that had been treating Mr. Jackson for a long time. So he was perfectly within his rights to not accept this independent medical examiner's opinion. And then with regard to the main issue in the case, which is whether this court should adopt a zone of danger test for the compensation of psychological injuries, well, there's basically four reasons why the court shouldn't. And the number one reason is that the plain language of the statute doesn't require it. The plain language does not distinguish between physical and psychological injuries. They broadly cover any injuries arising out of and in connection with a workplace accident, and that's what happened here. Secondly, courts that have interpreted this provision have not required a zone of danger test for Longshore Act cases compensating psychological injury. And thirdly, to impose such a test would be to tamper with the congressional scheme and to narrow a remedy created by Congress. And fourth, the developing case law and state workers' compensation does not require a zone of danger test. And with regard to the employer's argument that God shall should be persuasive precedent, well, that fact, as Judge Floyd alluded to, that case itself is not a, it's a FELA case, which is distinguished from a workers' compensation case like the Longshore Act. And the policy reasons enunciated by the Supreme Court in God shall just have no relevance in the Longshore world. We have limited and predictable liability for employers. There hasn't been any flood of trivial suits in these cases, even though the Longshore Act has compensated psychological injury for at least 50 years since the Hagan decision by the Seventh Circuit. And finally, there's also mechanisms in the Longshore Act to prevent fraudulent claims, namely they're adjudicated by experienced personnel, the ALJs and the district directors. And also if there is fraud, if the employer discovers fraud, they can always take advantage of the Section 22 modification provision to ameliorate that situation. Your position is the language in Consolidated Rail has no bearing here in the Supreme Court. Absolutely. It's a completely different statutory scheme that's founded on common principles of negligence. And our statute is not. It's a workers' compensation scheme. Apropos of nothing in particular, I once taught workers' comp, and it was always easy to fool the students by throwing in a negligence concept, and they always got distracted. Well, perhaps that's what we have here. Such an attempt. But if there's no further questions, that's basically all I have to say this morning. Can I ask a question to follow up in terms of that? The zone of danger, you understand that to be, that's required only when the employer actions have created a zone of danger? No, I would understand that as to whether the victim, the employee, was actually experienced physical injury or was threatened with physical injury. No, I'm talking about it from a theory standpoint. You're saying this introduces the element of negligence, which compensation, workers' compensation statutes do not have. But the zone of danger, is that, in terms of a negligence concept, is it saying that we don't look at whether or not the employer created some zone of danger and whether or not the person has to be within it? Or are we talking about that's more a limitation of making the claim too attenuated? I think it's the latter situation. I think in God's show they were looking at trying to limit an employer's liability to that zone of danger. So, yeah, they didn't want the claim to become too attenuated, so that was a way to limit it. All right, so it limits it to not the whole workplace. For example, if you were in the lunchroom and you found out about this horrible, tragic incident happened, you would say that you still could make a claim, right? Right. So there's no problem with attenuation being too far away from the scene. It's moving towards it. I mean, you have to look to whether the injury arose out of or in the course of the employment, and I think the fact finder would have to evaluate whether hearing about it in the lunchroom was in the course of the employee's employment. Maybe the workforce lunchroom, if he's talking to his coworkers and they explain it in graphic detail, maybe he could make it. Almost in this case, even if there were a zone of danger analysis, he would be in it because, in a sense, he's the epicenter of it, isn't he? Absolutely, yeah, he's the prime actor here. All right. But even in the hypothetical, the lunchroom, the ultimate question is whether there's an injury. So there has to be some finding of injury. Absolutely. He would have to support his claim with medical evidence. Right. But that's no different than hearing from it the day I was off. And I come in because people, the impact of this occurs normally because of the emotional profile a person has. You could be on vacation for a month, and you come back that your best friend was tragically injured like that, and you can have a legitimate case. So that's what I'm saying. It's no geographical aspect at all if you don't have some aspect. So we're not talking about whether or not you can make out a legitimate claim. That's a different matter. That's totally the medical side. But the zone of danger, I understand, what the employer is trying to introduce is, hey, if you don't have something like this, where's the end? I mean, because there's no end to what a person's, as you well know, people can have delayed reactions, something happened five years ago. We find those in terms of child abuse and things like that, people, adults, and late back when they were sexually abused and they were five years old. And they have incredible legitimate problems. So if the zone is not related temporally, no geographically, no in the course, what is the limitation if we don't look at it in some sense? But I think in this case, clearly he's right there. He caused it. But other cases, because you're a laborer, you represent the United States government. So why don't we look at this on a broader sense? That's what counsel is saying. Aren't we getting too far-fetched, even in a non-negligence environment? Well, definitely not in this case, Your Honor. That's all I can say here. Just because I'm not, maybe I'm not, I'm clearly not understanding. But the impact and the injury have to coexist, don't they? It has to be, you have to have the medical evidence of an injury, but you also have to have a rising out of during the course of it. And in the course of it, right, right. And would that, and I honestly don't know, would that be the case for someone who was on vacation? I'm not positive either, but I don't think it would be. I'm sorry. Yeah, I don't think it would be. Since 1990 and the Cotton case by the Benefits Review Board, which held that an independent evaluation means it's not dispositive. Right. Is that still the case? Yes. As far as the Benefits Review Board? According to the Benefits Review Board, cotton is definitely dispositive. In fact, the board case in the Jackson case revalidated, you know, relied on cotton. So cotton is definitely good law. Thank you very much. Thank you. Mr. Paulson, you have some time. Thank you, Honor. Judge Grugat, I think, frankly, you've summed it up correctly, which A, the zone of danger has nothing to do with negligence. It has to do with limiting damages. And to answer Judge Duncan's criticism, which is true, of psychiatrists, it's not me alone. That was one of the factors the Supreme Court had problems with, is they said, look, not only is it unlimited, because it's anybody who could witness it, or as Your Honor pointed out, who said, I found out about it when I came back to work, which would make it a rising out of employment. We're right, not only is it no limit, but we're dealing with something for which there's no way to really tell. And that's because psychiatrists can give a label to anything, and all you have to say is, I'm depressed, I don't feel well, and they've got a term for it. And there's no X-ray, there's no way to test it. If I can go back to your criticism of Dr. Manstein, saying it was really a legal opinion. Well, actually, I was just asking, you were presenting it as though you led with that. It seemed to me you were suggesting that it should be dispositive. Well, subject to just what the legislative history said in adopting the commission standard, which is an appellate review. And I don't see how you can say what the judge did in this case is an appellate review, because he said, I'm not giving it any extra weight. And I've got to say, that's totally irrational. Think about it. Congress sets up a provision to have somebody totally independent review something, and you're saying somebody who's totally independent, that's not going to be a factor? But if it's not dispositive, then what's your basis for saying that it should be given extra weight beyond that, accorded all the other expert testimony in the record? Okay, two reasons. One is common sense would tell us you give something extra weight if it's somebody independent who has no dealings with the litigation. Secondly, Congress in the legislative history said, we're going to follow what the commission said, and the commission said make it dispositive, subject to appellate review. Is there authority for that with respect to the weight accorded? Yes, it's in my brief. I will find it, thank you. Don't take your time. That's okay. It's on page 40 of my brief. But the government accepted that. They didn't dispute that's what the legislative history said, and they didn't dispute that's what the commission said. So we're not in disagreement what they said. I'm sorry. I understood Ms. Hurley to suggest that it's considered on par with any other expert testimony in the record. Well, she said that. But in their brief, they also admitted that the legislative history says exactly what I said it says, and the commission report says exactly what I said it said. Thank you. Okay. But let me address Dr. Mansfield's opinion. Because it wasn't a simple opinion. It wasn't like he just said, you know what, I'm about to retire, screw it, let's screw this guy. What he said was, he said, look, first of all, if you have PTSD, you're worse right after it happens. He said this guy wasn't. He actually, the licensed clinical social worker that has a master's degree said, hey, I think he's just a little depressed, he'll be fine. The initial doctor, family doctor, Dr. Stiles says, oh, he ought to be able to go back to work in four to six weeks. So he's saying he should have been the worst then, and yet all the reports of the doctor was he wasn't bad off at all. Secondly, he said PTSD gets worse over time. I mean, sorry, gets better over time, and yet for this claimant, it's gotten worse over time. And then third, he said, one thing that's standard on everybody who has PTSD, they don't want to talk about the incident because it's traumatic. And he said, this guy has no trouble talking about the incident. And then third, he said, this guy is not concerned that the treatment isn't working. He said, all my patients, if they're not getting better, they're going to be pissed, and they're going to tell me that. This guy is like, I don't even know what medication I'm on, I don't care that I'm not getting better. And then talking about the test results, and this is on page 162 of the appendix, what he said was the problem with the test results is he lit everything up. And so actually PTSD was not first. If you look at page 161, it was a tie between schizophrenia and post-traumatic stress disorder, although there was about a dozen other things that he also lit it up. And what Dr. Manshine said is, that can't be. These are conditions that have nothing in common. Schizophrenic don't have anything in common with a post-traumatic stress syndrome. So for you to light up the test for all these things tells me there's something wrong. And the judge didn't say that Dr. Manshine misinterpreted his results. The judge said was, Dr. Manshine used a test result without explaining why he did that. Well, no one criticized him for using a test result. In fact, it makes sense. Psychiatrists use psychological testing. So the judge criticized him for a reason that no one even argued. Thank you, Your Honors. Thank you so much. Thank you so much for your arguments. We'll come down to Greek Council. First, we'll ask the clerk to dismiss us for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Allyson K. Duncan, Henry F. Floyd